**IN THE COURT OF APPEALS OF IOWA**

No. 24-1279
Filed October 16, 2024

**IN THE INTEREST OF M.M.-P., K.M.-P., and K.M.-P.,**
**Minor Children,**

**K.P.-M., Mother,**
 Appellant.

_____

Appeal from the Iowa District Court for Scott County, Michael Motto, Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Barbara E. Maness, Davenport, for appellant mother.

Brenna Bird, Attorney General, and Lisa Jeanes, Assistant Attorney General, for appellee State.

Jean Capdevila, Davenport, attorney and guardian ad litem for minor children.

Considered by Tabor, C.J., and Chicchelly and Sandy, JJ.

**SANDY, Judge.**

The juvenile court terminated the mother's parental rights to M.M.-P., born in July 2015, K.M.-P., born in November 2016, and K.M.-P., born in February 2018, pursuant to Iowa Code section 232.116(1)(f) (2024). The mother appeals, arguing the juvenile court erred in ruling that (1) there was clear and convincing evidence that the mother's parental rights should be terminated pursuant to section 232.116(1)(f); and (2) there was clear and convincing evidence that termination of the mother's parental rights was in the best interest of the children pursuant to section 232.116(2). Following our de novo review of the record, we affirm.

## I. Background Facts and Proceedings

The Iowa Department of Health and Human Services (HHS) became involved in this case in April 2022, when the mother failed to pick up the two youngest children from daycare. The oldest was normally dropped off at the daycare after school but did not show. The mother could not be contacted.

The daycare contacted the mother's roommate, Rusty, who she met while living at a homeless shelter. He was unsure of the mother's whereabouts. Rusty had recently arranged for the oldest child to be brought to the school and taken to the daycare, but he claimed his truck had been borrowed by a different man who Rusty had arranged to pick up the oldest child. Rusty claimed he later found the oldest child with that man at a hotel room. Another unidentified man appeared at the daycare to pick up the other two children and threatened to blow up the daycare when the daycare workers refused to hand the children over to him. The HHS

worker reported that the mother was seemingly unconcerned with the situation that occurred.

A child-in-need of assistance petition was filed for each child on May 3, 2022. A removal order was filed on May 6, 2022, after a hearing, and the children remained placed together in family foster care. The adjudicatory order found that each child was a child in need of assistance pursuant to Iowa Code section 232.96A(3)(b) in regard to the mother. The children remained in foster care.

At the disposition in September 2022, the State, mother, and guardian ad litem (GAL) agreed the children should remain adjudicated, and agreed as to placement. A permanency hearing was held in May 2023 in which the State requested that the court grant a six-month extension for reunification. The mother and GAL agreed, although the GAL expressed skepticism, and the additional six-month extension was granted. At the time of the permanency hearing, the mother was homeless and was to book a hotel before any visit with the children. As of the date of the termination, none of the overnight stays have actually taken place—even after the mother moved into an apartment.

The mother has taken part in ordered psychological evaluations, which have resulted in diagnoses of posttraumatic stress disorder, major depressive disorder, and generalized anxiety disorder. The doctor recommended intensive outpatient psychological treatment, psychotropic medication, and that she only work part-time so that she may focus on her psychological treatment.

Another permanency hearing was held in November 2023. HHS argued the children should remain in foster placement and that the permanency goal should be changed to termination of parental rights and adoption.

By this time, the mother had moved to a temporary assisted housing apartment. HHS reported she was still struggling with her mental health issues and that she was struggling socially and with depression, and in interacting and functioning with others. An HHS worker stated she has "a difficult time handling herself and the kids" and is "not able to meet their needs and her own needs at the same time." While the mother was receiving some psychological treatment, her attendance had been inconsistent and her provider had considered dropping her. She spends a lot of time sleeping, including through visits during the day. She has missed visits at both her and her parents' homes and has missed phone and video calls.

There was a planned visit to a pumpkin patch that fell through when the mother was told it would be inappropriate to bring a new boyfriend with her. On a semi-supervised visit at the library, the mother left without informing the HHS worker where she and the children had gone. The HHS worker could not reach the mother on her phone to find out where she had gone. This scenario occurred at a visit to the park as well. That HHS worker stated that the mother has never answered her door for a visit. The HHS worker could only reach her via cell phone calls. The visits have since changed from semi-supervised to fully supervised. This worker did not believe that the mother is prepared to take on the challenge of raising the children.

The second day of the permanency hearing was held in December 2023, and the mother failed to appear due to transportation issues. The hearing proceeded without her upon the court's denial of her motion to continue. She appeared later during the hearing via Zoom. Another HHS worker testified that the mother had exercised all of her visits that month but that transportation is still an issue. She also struggles with handling the children for long periods of time. The third day of the permanency hearing took place in January 2024.

The mother's new apartment is large enough for children and she receives rent assistance, but the HHS worker stated it smells like marijuana. The mother works at a tire store and is dating her boss. The boss has been at the mother's residence unannounced on days scheduled for visits. His presence caused the HHS worker's supervisor to instruct the worker not to enter the home. This leads the worker to believe the mother is not addressing her issues with entering healthy relationships. In its termination order, the juvenile court noted the "docket contains an Illinois Department of Children and Family Services Investigation Summary from October 2021." That report revealed that two of the children had once been left at home from daycare with a person who was a sex offender and that the mother knew his criminal status.

The mother also keeps a list of "safe friends able to help the girls." This document lists individuals of unknown backgrounds, such as an individual simply referred to as "Shoe." The HHS worker stated that the mother's vetting system for these individuals is to check the sex offender registry. The mother indicates that all the individuals are at least acquaintances, but that "Shoe" should be removed.

The children have "severe" dental needs and the mother has not addressed those needs. When asked why she has not arranged for a dentist, she blamed insurance issues but conceded that she had found a dentist who accepts their insurance. She admitted that she has not yet set up appointments with that dentist and that she cannot say what has prevented her from doing so.

The July 2024 HHS case report states that "[t]he children appeared to be happy and healthy while in the placement home as well as appeared to have a strong bond with the placement since they were around the family before moving to the home. The foster parents already have their school and mental health services set up once school starts." The foster parents are now completing an adoption home study and the children have expressed a desire to stay with their foster parents. The children all express missing their mother but have conveyed a desire to stay with the foster parents.

The termination petition was filed in March 2024, and the hearing took place June 12-13, 2024. The mother was serving a sixty-day sentence in jail at the time of the hearing. The juvenile court entered its order terminating the mother's parental rights on July 26, 2024. She now appeals.

## II. Standard of Review

We review termination-of-parental-rights cases de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). That means "we review the facts as well as the law and adjudicate rights anew." *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) (citation omitted). In doing so, we give weight to the fact findings of the juvenile court, especially when considering credibility of witnesses, but we are not bound by them. *See In re H.L.B.R.*, 567 N.W.2d 675, 679 (Iowa Ct. App. 1997) ("Where there is

conflicting evidence on some issues, we give consideration to the juvenile court on issues of credibility.").

### III. Discussion

We generally employ a three-step analysis to review a termination of parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a permissive exception applies and should be exercised to preclude termination.  *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).

### A. *Statutory Ground for Termination*

The statutory grounds for termination under Iowa Code section 232.116(1)(f) are satisfied when all the following have occurred:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The mother does not dispute that the State proved the first three elements under paragraph (1)(f) but argues there was not clear and convincing evidence that, at the time of the termination hearing, the children could not be returned to her custody.

"A child cannot be returned to the custody of the child's parent . . . if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication or without remaining a child in need of assistance."  *In*

*re S.C.*, No.15-0262, 2015 WL 2089743, at *2 (Iowa Ct. App. May 6, 2015) (citing *In re R.R.K.*, 544 N.W.2d 274, 277 (Iowa Ct. App. 1995)). A parent's incarceration at the time of the termination hearing is grounds for finding that the child cannot be returned to that parent's custody—even if the parent is to soon be released from incarceration. *See In re W.M.*, 957 N.W.2d 305, 317 (Iowa 2021).

At the time of the termination hearing, the mother was serving a sixty-day sentence for contempt of court in the Linn County jail. Her release was scheduled for almost a month after the hearing. As a result, it was impossible to return the children to her custody at the time of the hearing. Returning the children to her at that time would have exposed them to the possibility of another child in need of assistance adjudication.

And the other arguments the mother makes are not compelling. She emphasizes that her lack of driver's license should not be held against her. But the district court referenced her lack of license in reference to her poor money management habits. Despite having the money to pay to reinstate her license, she spent that money on new tires for her vehicle—a vehicle she is not currently licensed to operate. And she has not made significant progress on paying the fines for reacquiring her license—she claims to have paid roughly $100 of the $1000 in fines. While she is not required to hold a driver's license, she consistently has issues arranging transportation for important events. She failed to show up to the second day of the permanency review hearing, and her other transportation arrangements often fall through. She agreed that a bus would be an option for transporting the children but admitted she has not taken steps to acquiring bus passes.

She also asserts that the allegations of exposing the children to strange men is "overblown." This argument demonstrates the mindset the juvenile court observed in its order:

> [The mother] still struggles to take responsibility for the removal. She testified that "Rusty was supposed to be responsible for picking up and dropping off." She stated that Rusty "failed to pick up the girls" and that is why the girls were "dispersed." Well, in April 2022 [the mother] had three girls aged 6, 5, and 4. Rusty was an adult male they had just recently met while Rusty was living in a homeless shelter. The girls never should have been around Rusty and Rusty never should have been in charge of anything with respect to the girls. . . .
>
> [The mother] still does not understand. [The mother] appears to think that the problem was that Rusty did not show up, rather than the fact that Rusty should not have been involved in any capacity at all. (cleaned up).

The mother chooses to argue that she did nothing wrong rather than argue the evidence shows that she has taken steps to ensure there are more responsible childcare arrangements in the future. We see this as an admission that these types of careless, ad hoc childcare arrangements will continue. Thus, we agree the statutory grounds for termination under Iowa Code section 232.116(1)(f) are satisfied.

### B. Best Interests of the Children

"Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the children's best interests." *In re A.M.,* 843 N.W.2d 100, 112 (Iowa 2014) (citation omitted). In considering the best interests of the child, we are to give "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

And we have stated, "the child's safety and the need for permanent home" are the quintessential elements of a best-interest analysis. *In re A.M.*, No. 20-0480, 2020 WL 4814170, at *4 (Iowa Ct. App. Aug. 19, 2020). A parent's past performance "may be indicative of the quality of the future care that parent is capable of providing." *See In re A.B.,* 815 N.W.2d 764, 778 (Iowa 2012) (citation omitted). Thus, "[r]ather than speculate about what the future holds for" a parent, "it is more accurate to look in the rear-view mirror and make a decision for [the child] based on what has already happened." *In re J.H.,* 952 N.W.2d 157, 171 (Iowa 2020) (citation omitted). "In determining [a child's] best interests, 'we look to [the parent's] past performance because it may indicate the quality of care [she] is capable of providing in the future.'" *Id.* (citation omitted).

And as outlined above, there have been many times when the children's safety has been a concern. They have been left in the care of unknown men and not been picked up from daycare, including an instance in which the man attempting to pick them up from daycare threatened to blow up the daycare. The mother has missed visits with the girls due to her sleeping habits. She has had to reschedule important visits the children were looking forward to (i.e. pumpkin patch) because of the priority she placed on other men. The HHS worker testified that at the removal hearing the mother suggested the children be placed with an unknown man from South Carolina. We believe the mother's past behavior is strongly predictive of her future behavior due to her failure to admit her past actions put the children in potential danger.

Accordingly, we affirm the juvenile court's termination of the mother's parental rights.

**AFFIRMED.**